## THE ROANOKE.

### (District Court, D. Oregon. June 29, 1914.)

### No. 5929.

SEAMEN (§ 29*)—INJURY IN SERVICE—LIABILITY OF VESSEL—DELAY IN OB-
TAINING MEDICAL TREATMENT.

Libelant, a seaman on a steamship, was thrown down by a heavy sea,
which struck the vessel just after she crossed the bar passing out of the
Columbia river, and both bones of one leg near the foot were broken,
and his leg was severely lacerated by striking against an iron obstruc-
tion. The captain, being of the opinion that he probably could not get
back over the bar for some hours, proceeded to San Francisco; a mate
and the stewardess, who was a nurse, in the meantime treating the in-
juries. On arrival at San Francisco two days later, libelant was taken
to the hospital for treatment, but it became necessary to amputate the
leg. On the trial of the case the testimony of neither of the two sur-
geons who treated the injury in San Francisco was taken, and the de-
scription of the injury by libelant and the others who were on the vessel
was not such as to enable physicians called as experts to express a satis-
factory opinion as to whether or not the leg could have been saved if
given surgical treatment sooner. *Held* that, in such condition of the evi-
dence, the court was not warranted in finding that libelant would not
have lost his leg and suffered as badly if given earlier treatment, and
in holding the ship liable because it was not given.

[Ed. Note.—For other cases, see Seamen, Cent. Dig. §§ 186, 188–194;
Dec. Dig. § 29.*]

In Admiralty. Suit by Henrik A. Dahl against the steamship Ro-
anoke. Decree for respondent.

H. Daniel and H. H. Riddell, both of Portland, Or., for libelant.
Carey & Kerr and C. A. Hart, all of Portland, Or., for respondent.

WOLVERTON, District Judge. This is a libel to recover dam-
ages against the steamship Roanoke, on account of personal injury
received by the libelant while aboard ship, and especially for alleged
negligence of her master and officers in failing to secure surgical and
medical attention sooner than was done.

The Roanoke is an iron ship of about 2,500 tons register, 275 feet
in length, and drawing about 18 feet of water. On the morning of the
28th of December, 1911, at 7:45 o'clock, while she was passing over
the bar outward at the mouth of the Columbia river, she encountered
a heavy sea, and a wave broke over her, and libelant, being on deck
about the cabin, where he had been engaged in closing the doors and
shutters, was struck and carried to the rear of the ship, and was in-
jured by coming in contact with the legs of an iron seat. Both bones
in his right leg were broken above the ankle, and he received a severe
injury below the knee; the flesh being cut and torn and the bone and
arteries exposed. The ship was bound for San Francisco and ports
south of there. The captain did not return to Astoria because the sea
was rough and squally, and he believed it would be unsafe to pass
back over the bar at the time, and that in all probability he would not
be able to get in before the next morning. In this emergency he con-

cluded it would be best to pursue his course to San Francisco, but with a view of stopping at Eureka to procure medical assistance for libelant if the sea and bar would permit. He is corroborated in his judgment touching the unsafe condition of the Columbia bar for passage inbound by Capt. Maland, of the steamship Tamalpais, who sighted the Roanoke as she was passing out. Maland, although in charge of a much lighter ship, was unable to get in over the bar until 1:55 o'clock in the afternoon. The captain was further of the view that his vessel could have gone in at almost any stage of the tide if the condition of the sea was favorable, but that it was problematical whether he would have been able to get back before the following morning, if even then.

As it relates to the nature of the injury received by Dahl he testifies that both bones of the leg were broken right above the ankle; that there was a big wound underneath the knee, about two inches (two or three inches, around there); that it came on both sides and in front, only the heavy flesh was not cut. Using the language of the witness, he says:

"And it was from the knee about even around, three parts of it was cut and one part left. Two-thirds cut."

Further on he testifies that the bone was exposed a little in front. Being asked how deep the cut was, he answered:

"It was quite a deep cut. * * * It must have been right in the bone, on the front. * * * The cut was mostly on the front and sides."

Dahl was taken into the social hall of the ship, and the stewardess, who was a practical nurse, assisted by the second mate, dressed the wound, and as best she could put the limb in splints and bound it so as to keep the foot in place until he could be taken to the hospital. As a precaution, in order to be ready in case of extreme hemorrhage, she put a bandage about the limb above the knee, but did not draw it tight, being able to put her hand, or a part of her hand, under the bandage, which indicated that it was not tight enough to stop circulation, although it might have impeded it slightly. There was considerable hemorrhage from the wound, but the endeavor to stop this was by the use of antiseptic gauze and cotton. As to the bandage, Dahl testifies that it was a tight one, very tight above the knee; that it hurt him for a few hours afterwards, but knocked off hurting in the afternoon; that he does not know whether the bandage was tight enough to stop the blood flowing, but supposes that was what they put it on for, because they were afraid he would bleed to death. In the afternoon his ribs were hurting him, and a bandage was put around his person, which, together with the bandages on the limb, remained on until Friday about midnight. Feeling much pain from the bandages, Dahl loosened both of them; that is, the bandage about his person and the one upon his leg. After doing this he feared he was bleeding, and called the stewardess and second mate to his assistance, but it turned out that there was no unusual hemorrhage.

When the vessel arrived in San Francisco, which was on the morning of December 30th, about 6:30 or 7 o'clock, he was taken first to the Harbor Emergency Hospital, and after that to the Marine Hospital.

An X-ray was taken of the fracture. His limb was placed in a box, and a weight put on it to resist the contraction of the muscles, and the wound was treated by the surgeons at the hospital. During the treatment pieces of flesh were cut from the wound. Sometimes Dahl would feel the knife and at other times not, and on Thursday, the 4th of January, it became necessary to amputate the limb, which was done.

Based upon the testimony alone of Dahl as to the nature of his injury and the manner of its treatment by the stewardess and the surgeons at San Francisco while in the hospital, hypothetical questions were propounded to two physicians, emphasis being placed upon the manner in which the limb was bandaged, the statement in one case being that "He was taken into a room and a bandage was placed around his leg above the knee and tightened sufficiently tight to restrict the bleeding and to stop the flow of blood," and in the other "tight enough to prevent bleeding," and it was the opinion of the physicians that, if the bandage was put on tight enough to constrict any severe hemorrhage that might have occurred, the treatment might have caused gangrene, and hence would result in amputation. One of the surgeons testified that:

"So far as your (counsel's) description goes, there is nothing about the injury that you mention which would make it unlikely that the limb would survive or recover."

But on cross-examination, being asked:

"Can you, or can any practitioner, say from the bare statement given you by counsel here, can you undertake to give a definite opinion as to whether or not that leg could have been saved by earlier treatment?"

He answered:

"Oh, no. One could not tell what the condition was by the description I have. It is not sufficiently definite."

The other surgeon was asked a similar question, and answered:

"I could not say without knowing more of the extent of the injury and the case itself."

The testimony of the stewardess and the second mate would seem to indicate that the wound was more severe than as represented by Dahl, and that the bandage above the knee was not put on as tight as he seemed to think. The stewardess testifies:

"To me it seemed a terrible wound. It was badly lacerated. The bones seemed to be exposed quite a bit, and he was bleeding profusely. I then took this sterilized gauze, after washing it out with the cotton, and kind of pressed it into the wound to keep it as clean as possible until we could remove him to some place where he was a little more comfortable. * * * It seemed to me at the time that there must have been a piece of flesh removed about the size of my hand."

She further says the arteries were exposed, and the tissues seemed to be bruised terribly, and there was a fracture of both bones of the leg above the ankle. As to the treatment, she says:

"We were very much afraid of a hemorrhage. We got some boards to kind of fit in so that his leg would not move too much * * * and tied a bandage around the upper part of his leg to prevent a hemorrhage at that

time. * * * I placed the bandage around the knee for some time, and when I noticed that there was no fear of hemorrhage I put my finger underneath and showed Olson that it was not too tight to make him too uncomfortable."

She further says that Dahl complained about the bandages all along, that they were too tight; but witness knew they were not too tight at that time. When asked if they were tight enough to stop circulation, she answered, "Not to my knowledge." Being further asked if she intended to have them so tight as to stop circulation, she answered:

"No, I was afraid of the hemorrhage, and that was the reason of putting it on; but I didn't put it on so tight, because Mr. Olson remarked, 'In case it is necessary we will have to draw it tighter.'"

On cross-examination she testifies, touching the wound, that it was quite a cut; that the bone was exposed for a space of almost 2x2 (meaning two inches square); that this was in front, and the laceration went quite a way down on the inside of the leg, but was not so bad on the outside; that the whole cut would extend halfway around the leg; that it was bleeding considerably, enough to make him weak, and he was continually losing strength; that the purpose of the bandage was to stop the hemorrhage in case it should come all of a sudden, in which case she would be able to help him. About this she was further examined as follows:

"Q. And again, what was the purpose of putting on the bandage? A. The bandage was that I was afraid of a hemorrhage. Q. Well, did the bandage operate to stop the flow as you put it on? A. Not as I put it on. I put it on so that in case there was a hemorrhage I could act instantaneous. Q. So you could draw it tight? A. Draw it tight. Q. Was it so tight when you would draw it, it would hold itself? A. Well, I put a sheet about three or four times, laid it over so it would be strong enough. But I showed it to the second officer, it wasn't too tight at the time that if necessary—I just put my hand under this way. Q. Then as I understand you, as you had the bandage on it did not stop circulation? A. No, sir; it could not stop it. Q. You stopped the hemorrhage then by the use of the gauze? A. By the use of the gauze. Q. And not by the bandage? A. No. It was flowing constantly; and even the morning we reached San Francisco it was still flowing."

The stewardess is corroborated in almost every particular by Olson, the second mate. He says of the wound:

"I can't remember which side, whether it was on the inside or the outside, a piece of flesh was missing about two inches—one piece of the flesh was loose. It must have been three inches wide and an inch, say, thick, five or six inches long, as well as I remember, was loose laying down over the foot, and I took that piece up and I put it in place. I remember we took it back again afterwards to wash it off. But that piece seemed to me to be about five or six inches long. Which side of the leg I can't remember. The bones were exposed on one side."

As to the bandage he further says:

"It was placed above the knee so that in case it would start to bleed much I could have screwed it up and tightened it up like to stop the bleeding; but I said, 'That will be the last thing that we will do, I know, because I know his leg will swell up if we tighten that up.'"

The surgeons at the Marine Hospital who treated the patient were not called, although they could have been, or their depositions might

have been taken. One of the surgeons had been transferred to Washington, D. C., and his testimony might have been taken there. The case has been pending more than a year prior to trial.

Negligence upon which recovery is sought is based upon two grounds: First, unseaworthiness of the ship; and, second, the neglect of the officer to turn back to Astoria so that Dahl might have been sooner afforded relief by securing treatment from a competent surgeon.

As to the first ground, it is wholly without support under the evidence.

Upon the second ground, it may be admitted that the captain should have turned about and gone back to Astoria, getting in over the bar when he could. I am induced to believe, nevertheless, that a cause has not been proven such as will warrant the court in passing judgment for the libelant. There are two features which militate against the establishment of his cause; the first being that the prima facie case which is claimed to have been made out by the production of the testimony of libelant and the medical opinion of the two physicians is greatly weakened by the fact that libelant failed to produce the better evidence. This failure consists in not having called the physicians and surgeons at San Francisco who attended libelant after his arrival at that port. It goes without saying that they would have been able to describe the condition of the wound with much greater accuracy than it has been described even by the stewardess and the second mate. Dahl himself, as is apparent, was unable properly to describe the wound and detail its treatment so that an expert called for the purpose would be able to give a reliable opinion as to whether amputation would have been prevented had Dahl received earlier treatment. The physicians called recognized this, and practically admitted their inability to give a satisfactory opinion upon his testimony alone.

The other feature consists in the fact which I have just alluded to, that the physicians who were called did not have the full and accurate facts before them upon which to base an opinion. If the opinion had been based upon the testimony of all the witnesses concerning the nature of the wound and its treatment on the way to San Francisco, as well as the symptoms developing and its treatment there, their judgment would undoubtedly have influenced the mind of the court; but, not having that information, they could not pass a reliable opinion; a thing they themselves appreciated.

From all the testimony in the case, and from the manner in which the expert evidence comes to the court, I am unable to say that Dahl would not have lost his limb nor suffered as badly had he received earlier treatment, say within 24 hours or less time after the accident happened.

The libel should be dismissed, and such will be the order of the court.